**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT**

IN RE:  SHERRON ANN ROBERTS                     CASE NO. 11-30433
      (DEBTOR)

FARMERS BANK OF MILTON                              PLAINTIFF

 v.                                                               AP NO. 11-3010

SHERRON ANN ROBERTS                               DEFENDANT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the trial in this adversary proceeding, conducted on January 26, 2012, the parties offered documentary evidence as well as witness testimony.   Having considered the Joint Stipulations of Facts, Doc. 31, and the proof herein, the evidence supports the following findings of fact:

On September 4, 2007, Defendant Sherron Ann Roberts submitted a Personal Financial Statement to Plaintiff Farmers Bank of Milton for the purposes of obtaining credit for her daughter, Rebecca L. Hawkins, and her son-in-law, William A. Hawkins, and to serve as cosigner and guarantor of the Hawkins' loan from the Bank.  Exhibit 1[1].

The Financial Statement listed Roberts' assets and debts which included $45,000.00 in cash on hand; $20,000.00 in marketable securities; $150,000.00 in real estate, and $60,000.00 in personal property.   The only debt listed was $6,500.00 representing the balance owed to BB&T Bank on a vehicle.   Roberts listed her annual income at $26,000.00 per year.

Immediately above the signature on the Financial Statement is a paragraph which reads:

For the purpose of procuring credit from time to time, I/We furnish the foregoing as a true and accurate statement of my/our financial condition.  Authorization is hereby given to the Lender to verify any and all items indicated on this statement

---

[1]     The referenced exhibits were admitted into evidence without objection.  For ease of reference and consistency, exhibit numbers are those of Plaintiff Farmers Bank as included in Doc. 27, Plaintiff Farmers Bank of Milton's Exhibit List.

in any manner it deems appropriate including, but not limited to, obtaining a credit history report.   The undersigned also agrees to notify the Lender immediately in writing of any significant adverse change in such financial condition.   The undersigned acknowledges that I/We have been advised that making false statements, or reports, or willfully overvaluing any land, property, or security for the purpose of influencing the credit to be extended will subject Me/Us to possible criminal liability under the law.

George Carpenter, the Bank Vice President, testified he reviewed the Financial Statement with Roberts at the Bank's office before the closing on the loan.  He questioned the cash value of life insurance listed as an asset; and confirmed with Roberts the value listed was actually the face value of the policy.  Carpenter had Roberts strike through the face value and place her initials on the correction showing the insurance did not have $200,000.00 in cash value.  Carpenter testified the totals listed for Roberts' assets, liabilities and net worth were in his handwriting.

Roberts acknowledged the signature appearing on the second page of the Financial Statement was her signature.  She admitted she presented the Financial Statement to the Bank for review and for the purpose of her serving as a cosigner for her daughter's loan.  She further testified she understood her daughter and son-in-law could not obtain a loan from the Bank without her serving as cosigner due to a history of late payments to the Bank and their previously filed bankruptcy.  Roberts stated she knew her daughter and son-in-law were having problems paying bills, her daughter wanted a new truck and her daughter could not get the money to finance the purchase without a cosigner.

Carpenter testified he approved the September 7, 2007, loan in the amount of $70,804.80, having loan number 350-537-5, to the Hawkins with Roberts as cosigner.  Exhibit 2. Loan 350-537-5 consisted of a renewal of a past due loan made by the Bank to the Hawkins,[2] plus an additional sum of $33,433.38 paid to Earl Floyd Ford for the truck purchase.

Carpenter explained the Bank would have sued the Hawkins on the debts owed and repossessed the equipment the Hawkins utilized in their trucking business had the Hawkins not

---

[2]       Loan number 350-447-6 was dated January 9, 2007, in the original amount of $37,305.43.

renewed the past due loan.  The Bank would have applied the proceeds from the sale of the collateral toward the Hawkins' debt.

Carpenter described Roberts as a "solid" cosigner.  In approving the loan to the Hawkins, Carpenter stated he relied on the information contained in the Financial Statement. Carpenter also obtained an Equifax credit report which showed Roberts' credit score of 788, which Carpenter testified was a good score and which confirmed he had no reason to believe Roberts' Financial Statement was not true and accurate.

In addition to cosigning the loan, Roberts also signed a Guaranty wherein Roberts absolutely and unconditionally guaranteed the full payment of loan 350-537-5.  Exhibit 3.

Within a few months after loan 350-537-5 was closed, the Hawkins became delinquent on their payments.  Carpenter testified late notices were sent to the Hawkins with copies to Roberts advising of the late payments.  He said Roberts called him after she received the late notices, and told him she wished she had never cosigned her daughter's loan.  Roberts expressed concern about what would happen if the payments were not made as due. Carpenter explained the Bank would enforce the note and Roberts' personal guarantee allowed the Bank to collect from her or sell her assets including her real estate to satisfy the debt.

In April 2008, loan 350-537-5 was in default; the Hawkins having paid only nominal amounts toward the loan.  Exhibit 4.  The Bank agreed to renew the loan lowering the payment obligation.   Loan number 351-649-0 renewed loan 350-537-5; establishing 59 monthly payments of $768.83 and a final payment of $38,590.49.  Exhibit 7.  Roberts also cosigned this loan.  Hawkins and Roberts defaulted on loan 351-649-0.

The Hawkins were also in default on a January 2006, loan from the Bank which was cosigned by Phillip McManis.  Exhibit 10.  In an effort to give additional time for the loans to be paid, the Bank refinanced both past due notes – loan 351-649-0 and 351-755-1[3] – in one note

---

[3]    Loan number 351-755-1, dated October 21, 2008, was the first renewal of the original January 2006 loan cosigned by McManis.

having loan number 351-782-9, dated December 20, 2008.  Exhibit 16.  Roberts and McManis cosigned this note.  Roberts guaranteed $65,303.12, representing the amount of the original loan indebtedness remaining.  Exhibit 17.  McManis guaranteed the balance, representing the amount of the original loan he cosigned for the Hawkins.

The Hawkins filed a petition under Chapter 13 of the Bankruptcy Code on October 10, 2009.[4]   The Bank filed a proof of claim for $90,362.87; the balance owed on the December 2008, loan.  Pursuant to an agreed order modifying and terminating the automatic stay, the Hawkins and the Chapter 7 Trustee abandoned any interests in the collateral securing the December 2008, loan.  The Bank was allowed to repossess and liquidate the collateral, applying the proceeds of disposition in the order allowed by law.

Roberts filed a petition under Chapter 7 of the Bankruptcy Code on June 29, 2011.  Carpenter testified the Bank was surprised by Roberts' bankruptcy filing because the Financial Statement on record with the Bank indicated Roberts had significant assets and minimal debt.  The Bank filed a proof of claim for $65,303.12, representing the amount cosigned and guaranteed by Roberts on the December 2008, loan.[5]

A review of Roberts' schedules, filed with her bankruptcy petition, indicates she has no real estate nor any of the other assets listed on her Financial Statement.

On December 14, 2007, three months after the Bank approved Roberts for the first time as a cosigner and guarantor on a Hawkins' loan, Roberts transferred her residence and twelve acres to a second daughter, Leann Chesher.  The deed, listing the consideration as "nominal" and as "love and affection," stated the transfer was a gift between parent and child.  Exhibit 19.  Under oath, both Roberts and Chesher stated the value of the transferred real estate was $76,200.00.

---

[4]     William A. Hawkins Jr. and Rebecca L. Hawkins, case number 09-30787.
[5]     The Bank has not filed an amended proof of claim reflecting the disposition of the sale proceeds. Pursuant to an order of this court, Doc. 45, the Bank filed an accounting of loan number 351-782-9 showing the balance owed on the portion of the loan attributed to Roberts is $46,265.31.  *See* Doc. 46.

4

Carpenter testified at no time after Roberts presented her Financial Statement of September 4, 2007, did she tell the Bank, in writing or otherwise, that she transferred her real property or that she did not possess the assets listed on her Financial Statement.  He stated the Bank would not have accepted Roberts as a cosigner on any future loan if Carpenter had knowledge Roberts transferred the real property as a gift to Chesher.  Carpenter also testified the Bank would have declined to renew the Hawkins' loans and would have exercised its rights to repossess the collateral and proceed against the Hawkins and Roberts much sooner if Roberts had provided an accurate picture of her assets and liabilities.

Roberts admitted at trial she never told the Bank, in writing or otherwise, she had transferred her house and land to Chesher.  She further testified she did not know the source for the values assigned to the real property or other assets on her Financial Statement.  At trial she admitted, as of September 4, 2007, when Roberts signed the Financial Statement, she:

- did not have $45,000.00 in cash;
- did not have $20,000.00 in marketable securities;
- did not have $60,000.00 in personal property, and
- did not know the source of the $150,000.00 real estate value.

Roberts testified her income as a hairdresser never reached the sum of $26,000.00 per year, and she could not explain why the Financial Statement contained that sum as her annual income.  Roberts admitted she worked at a nursing home – two days per week earning $13.00 per person serviced and ten hours on the weekends as a housekeeper earning $9.39 per hour.  Roberts also worked as a hairdresser one day per week at another nursing home earning $10.00 per person.  She had no other sources of income in 2007.  Roberts further testified her gross income was accurately listed on her bankruptcy schedule at $1,500.00 per month.  Her income has not changed significantly since 2007.

Roberts denied the allegation she transferred the house to Chesher to prevent the Bank from making a claim against the real property as a result of the Hawkins' defaults.  She said the house was transferred to Chesher to prevent a nursing home from forcing the sale of the house

if Roberts should ever need nursing home care.  Roberts did not know the source of the fair cash value for the property as listed on the deed and stated the attorney who prepared the deed "did it."  Roberts admitted she contacted the attorney and made arrangements for herself and Chesher to sign the deed at the attorney's office.

Roberts did not file a gift tax return in conjunction with the transfer of her residence.

Roberts knew at the time she transferred the house to Chesher the Hawkins' loan was in default.  She received late notices from the Bank and also talked to Carpenter about the Bank's ability to proceed against her for the amounts due on the loans.

At no time did Roberts make any payments on the Hawkins' loans.

Since the transfer of the real property, Roberts continues to live in the residence and pay all associated expenses including utilities, insurance and taxes.  She does not pay rent to Chesher.  Roberts testified she transferred the house solely to Chesher because she believed Chesher was more financially responsible and Chesher would be "fair" and would "take care of her sister."  Roberts testified to no awareness of Chesher having any financial problems.

In her testimony, Chesher confirmed her mother remained in the residence and has used the house exclusively since Roberts deeded to the property to her.  Chesher also confirmed she receives no rental income from the house and Roberts pays all expenses associated with the house.  Chesher has never filed bankruptcy and was not experiencing financial problems at the time of the transfer.  The real property remains in Chesher's name and is unencumbered.  Chesher considers the property to be her mother's property exclusively.

Carpenter stated the Bank located and sold some of the collateral securing the Hawkins' loan.[6]  He further acknowledged McManis is now deceased and the Bank has filed a claim against his estate for payment of the sum he guaranteed.  Carpenter stated the Bank has

---

[6]     The Bank obtained relief from the automatic stay in the Hawkins' bankruptcy case on six pieces of collateral: (1) 2001 Freightliner, (2) 2007 Ford Five Hundred, (3) 1994 GMC 1500 pickup truck, (4) 2003 Reitnour flat bed truck, (5) 1954 Ford tractor, and (6) John Deere Lawn Tractor.  Carpenter testified the Bank was unable to locate the tractors listed at items (5) and (6).  Items (1)-(4) were sold. Carpenter testified to the approximate amounts received for each piece of collateral sold.

received no funds from the McManis estate, but expects the estate to eventually pay the claim. *See* Plaintiff's Accounting, Doc. 46.

The Bank seeks a determination the $65,303.12, debt owed to the Bank representing the amount cosigned and guaranteed by Roberts on the Hawkins' December 2008, loan is nondischargeable under 11 U.S.C. § 523(a)(2)(B).   The Bank contends Roberts obtained the renewal or refinancing of credit by the use of a materially false Financial Statement.

To prevail under § 523(a)(2)(B), the Bank must prove by a preponderance of the evidence, *Grogan v. Garner,* 111 S.Ct. 654 (1991); *Rembert v. AT&T Universal Card Services*, 141 F.3d 277, 281 (6th Cir. 1998), the Financial Statement is a statement in writing that was (i) materially false; (ii) respecting Roberts' financial condition; (iii) on which the Bank reasonably relied and (iv) Roberts caused the Financial Statement to be made or published with intent to deceive.

The foregoing and the evidence of record establish the Bank refused further credit to the Hawkins without a cosigner.   Roberts provided a signed Financial Statement to the Bank along with a personal guaranty.   The Financial Statement contained erroneous information regarding Roberts' real property, personal property, bank accounts and income.   The Financial Statement purported to show Roberts had a net worth of approximately $268,000.00.   Carpenter reviewed the Financial Statement with Roberts.   Carpenter examined Roberts' credit report.   Carpenter had no cause to suspect the Financial Statement was erroneous.   The Bank extended further credit to Hawkins.

The Financial Statement was clearly false with respect to Roberts' assets and liabilities, *i.e.* her financial condition.

Roberts argues the Bank is unable to prove the Financial Statement was materially false.

Material falsity has been defined as "an important or substantial untruth."   *In re Copeland*, 291 B.R. 740, 782 (Bankr. E.D. Tenn. 2003).   The untruth is "material" if it influences

the creditor's decision to extend credit.  *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995).  The question is would the Bank have made the loan if it had known the true extent of Robert's financial condition?  "A statement can still be material if it is so substantial that a reasonable person would have relied upon it, even if the creditor did not in fact rely upon it in the case at hand."  *Id.*  Carpenter testified the Bank would have explored its rights under the loan agreements and/or declined to extend additional credit if the Bank had been aware of Roberts' true financial condition.  The testimony of record establishes the information regarding Roberts' financial condition in the Financial Statement is definitely material.

Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances.  *In re Ledford*, 970 F.2d 1556, 1560 (6th Cir. 1992).  "Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'"  *In re Woolum*, 979 F.2d 71, 76 (6th Cir. 1992) quoting *In re Martin*, 761 F.2d 1163, 1166 (6th Cir. 1985).

The evidence establishes Roberts obtained an extension of credit which was subsequently refinanced based on her materially false Financial Statement.  The Financial Statement was materially false in that the assets listed did not exist or the assets that did exist had inflated values.  Further, Roberts misrepresented her annual income stating it was $26,000.00 per year, when in fact it was only approximately $1,500.00 per month or $18,000.00 annually.  Roberts was fully aware the Bank would utilize the Financial Statement to determine her qualifications as a cosigner and guarantor for her daughter and son-in-law's loans.

The evidence further establishes Carpenter, as the Bank's Vice-President responsible for the Hawkins loan, reasonably relied on the Financial Statement in approving the loans made in September 2007, April 2008, and December 2008.  As Carpenter testified, Roberts' good credit score supported the information contained in the Financial Statement as it showed no credit history problems and gave him no reason to believe the assets and their values were in

any way misrepresented by Roberts.

The Bank can show intent to deceive if it shows Roberts was reckless when allowing the Bank's continued reliance on a Financial Statement Roberts knew was not true.  *In re Batie*, 995 F.2d 85, 90 (6th Cir. 1993).

The evidence establishes Roberts gave the Financial Statement with the intent to deceive the Bank into making the loan to her daughter and son-in-law with her as the cosigner. Roberts admitted in her testimony she knew the Bank was not going to make the loan unless she qualified as the cosigner and gave a personal guarantee because her daughter had previously filed bankruptcy and she and her husband were having problems meeting their financial obligations.  While Roberts denied knowing the Hawkins were in default in September 2007, when she originally gave the Financial Statement, Carpenter testified he reviewed the loan documents with Roberts and explained the Bank would only lend new money if the current loan, which was in default, was refinanced as well.  Roberts not only cosigned the promissory note with the Hawkins, but she also signed a separate guaranty.

Further, the parties agree at no time did Roberts inform the Bank she gifted her real property, representing her primary asset of value, to Chesher, thereby substantially changing Roberts' financial condition and her ability to serve as a cosigner and guarantor.

Roberts cosigned several loan documents and personal guarantees at the Bank, but at no time volunteered the information she no longer owned the real property or that her assets and income were not as represented on her Financial Statement.  Moreover, Roberts transferred her home to Chesher within a few months of signing the original promissory note and guaranty, after receiving late notices from the Bank regarding the loan cosigned in September 2007.  Thus, at the time Roberts transferred the house and land to Chesher, Roberts understood the note she cosigned was already in default and she was legally obligated to repay the Bank the monies for which she had cosigned.

The foregoing constitutes the findings of fact and conclusions of law.  In reaching the

conclusions, all evidence, exhibits, testimony and arguments were considered, regardless of whether or not specifically referenced herein.  Based upon the foregoing, judgment shall enter for the Bank determining the balance for the amount cosigned by Roberts on the Hawkins' December 2008, loan is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

A separate order of judgment shall be entered accordingly.


Copies to:
Ruth H, Baxter, Esq.
Joseph S. Yates, Esq.
Debtor

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
***Joseph M. Scott, Jr.***
**Bankruptcy Judge**
**Dated: Tuesday, April 17, 2012**
**(jms)**